hospital. This is obviously not a case in which the defendants have claimed that the evidence is insufficient under Jackson v. Virginia to support conviction on any of the six charges on which the defendants were convicted. A properly instructed jury at a trial without sufficient evidence to convict on these charges. At the same time, it bears emphasis that the defense had a theory and presented evidence that a properly instructed jury could have concluded either failed to, the government had either failed to prove its case beyond a reasonable doubt or at least had not, would not unanimously reach the conclusion that the guilt had been, had been proven. And the issue here is, was the jury correctly instructed? Was all of the evidence permitted that would allow the defense a full and fair opportunity to defend? And let me quickly, the answer I think to those questions is no. Let me quickly break the counts down into two groups. Obviously, the first critical one is the 287 false claim charges. The defense theory essentially here was twofold. One was that they had presented on these three forms a reasonable and equitable statement of nursing costs. Whether it was wholly accurate, whether they knew it to be exactly what had been proven by supporting documentation. Obviously, the documentation was not adequate in this case. It was reasonable and adequate. And secondly, that in a sense, the statement that they made didn't matter because they were going to be entitled to the routine cost limits. That's all they were going to be entitled to. And therefore, the statement on there was both reasonable and equitable, and furthermore, wouldn't have made a difference as to the amount of money they were going to be paid by the government. That was their theory. And I submit that the jury could have rejected it. They could have listened to the evidence and said, we don't believe it. We don't think that was what was going on. But they didn't have the tools to consider the defense. And the reason is that they didn't have the instruction that the statement on the ACR, the annual cost report, had to be material. It had to be one that could influence the government. And secondly, they didn't have the instruction that said, look, if these regulations are ambiguous, then the government is going to have to prove that the statement is false under any reasonable interpretation of them. And let me give you a perfect example of why these instructions were so critical. The government's position was, you have to put down actual nursing costs there. And if you put down a figure that you know isn't borne out by documents, that's a crime. But these regulations are immensely complex, and they say that the government will reimburse for reasonable and equitable costs. Under those regulations, somebody could say, let's have a hypothetical. Somebody comes in and says, you know, the accountant, it turns out, has been drunk all this year. The documents are a mess. We can't come up with documents that give a precise figure on nursing costs. And somebody could say, well, under the regs, let's just make our best effort in good faith and give them a reasonable allocation of nursing costs, and we're acting within the law. The government may say, no, that is not what the regulations require. You have to have precise documentation. But a jury that was told that if there's an ambiguity, and if somebody could fairly conclude that a reasonable and equitable statement of cost is adequate, then a jury could find, hey, there's not a crime here. There may be civil liability. There's not a crime. And secondly, if a jury is told that there has to be materiality, then they can say, and there was plenty of testimony in this record, that it is very difficult and often impossible to get beyond routine cost limits. And therefore, the statement of nursing costs, if it was above that, was not material. So we are confronted there. If that's the defense position, that they were entitled to these two instructions, we Well, let's talk about the materiality of the instructions. Yes. That's where we are now, Your Honor. That's the problem for you, I think, because the defense counsel withdrew its objection to that. It absolutely did, Your Honor. And there's no question that as a result of that, we have to labor under the plain error test. But the government is saying that we can't raise it at all because it's invited error. And they're clearly wrong on that, because what the record reveals is that they wanted this instruction. The defense wanted the instruction. The government came in and said, Taylor settles it in the Ninth Circuit. It's all over. There's no materiality. And the court at the final instructional conference said, hey, I already knew that materiality is not an issue. That's the end of it. The defense acceded in that. So they did not but maintain their request. But if it is correct that materiality is an element, as this Court held very recently in Al Foreen, the failure to instruct on materiality when it's an element is plain error. So I think we must at least confront the question of whether — and for the first time since Nieder, since Gowden, of whether materiality is an element of a 287 offense. And I submit, Your Honor, that it clearly is. If 287 is a fraud statute, under Nieder, materiality is an element. Nothing in Taylor, the 1995 decision which preceded Nieder, can help the government in the face of the United States Supreme Court opinion in Nieder. You look at the history of this statute. We've laid it out in our brief. It's a Civil War statute in which the United States government said, essentially, we were ripped off shamelessly during the Civil War. We are going to pass an anti-fraud statute. Nieder says that it doesn't have to have the word materiality. If it's an anti-fraud statute, it's got a Well, okay. Let's assume that for the moment, that you're right. Now, prove to us that it is not harmless error. Well, again, Your Honor, the — what we're dealing here is with a situation — and I don't know if the Court had the same problem that I did. But if you read this record, quite clearly, because the record is a mess and doesn't describe it. One thing, though, that does come through — it's true in the case law — is that you don't get what's beyond the law.  But there's a lot of evidence in here, and the defense presented substantial evidence. But wait a minute. Now, St. Luke's enters into these agreements with Medicare openly, voluntarily, and freely. They don't — they couldn't restrict their patient admission to non-Medicaid patients. Sure. Or non-Medicare patients, for that matter. Essentially, a private institution never get into the government audit problems, right? That's correct, Your Honor.   and they're told, and they're told, and they're told, and they're told, and they're told, And that's right, Your Honor. Set them aside and say they're totally unapplicable, and it's a little far-fetched. Your Honor, if I meant to suggest that, please let me withdraw the suggestion. What I am simply saying is that they — St. Luke's presented substantial evidence in this case that — look, their records were a mess. There's no question about that. They didn't have adequate records. But there's some testimony that it's deliberate. Absolutely. Absolutely. There was substantial testimony it was deliberate, Your Honor. But let me just point out one thing. Judge Patel made a specific finding that all of the testimony and all of the witnesses who testified that this was deliberate on the part of Mr. Seaton, she said, every one of them has lied under oath, and there's a serious credibility problem with them. That doesn't mean the jury wasn't entitled to believe them, okay? But this is not a situation where the facts testified by these witnesses were established beyond challenge. The defense put in a massive study that said, at the end of the day, given the acuity of these patients, the costs that were put down on the annual cost reports were reasonable and equitable. And the answer, I guess, to your question, Judge Fletcher, is simply this. If a jury had been told that it's got to be a material misstatement, they could have said, wait a minute, I mean, it may not be wholly accurate, but in terms of influencing the government to be defrauded of money, given the testimony of reasonable and equitable cost for nursing, we find that the difference wasn't material. That is what we would submit, that between the routine cost limits, which make it – which St. Luke's was going to be entitled to, and the fact that there was evidence that it was reasonable and equitable, a jury could have said, wait a minute, we find – we find that Seaton knew that he didn't have documentation for that number, okay? But we find that he went out there, he said, let's try and get a reasonable number. He in fact got the number within the ballpark, and given the routine cost limits and the limitation on those, the statements on there were not material. So for those reasons, I think the element of materiality, if – and I hope the Court agrees, which is a required element of the statute, the failure to instruct on it would be – would be reversible error in this case. You're kind of skating around what he did apparently, deliberately, which was to put all of the licensed registered nurses' costs on the government patients when that wasn't really accurate, and there were other lesser-paid people who performed part of the services on each side. Your Honor, if the Court is going to deem that testimony true as a matter of law, the I would submit to the Court is simply – and it's in our reply brief, it's at page 17 of the reply brief – we detailed Judge Patel's statements in which she said, I am going – she went to the extraordinary step of immunizing Orrin Grover. The government said, we might prosecute Orrin Grover. So we're not giving him immunity. She said he's critical. The defense has a right to put him on because the prosecution has put on witness after witness, and they've said that Seton, you know, manipulated the figures in these ways. And she said there are serious doubts of credibility about what they say about the mutual of Omaha audit because every single one of them has lied under oath. And, Your Honor, I am submitting to you that a properly instructed jury could say, you know, there were all a bunch of liars under oath, but I believe their testimony on balance, and I'm going to convict. But what I'm saying is, given those problems, I don't think we can say, well, it was – they had a defense, and maybe with a materiality instruction, that defense would have mattered. But the – we're going to find that these witnesses are so credible that they wouldn't have paid any attention to the defense evidence because they would have found that Seton was so explicitly and clearly engaging in false practices. So, Your Honor, I would submit to you, given Judge Patel's statements, we cannot consider this a one-sided case, and if it's not a one-sided case, if a jury had conflicting testimony on things like reasonable cost, then correct instructions are what make the difference. And I would submit that both of the instructions, the failure to give a correct migliaccio, let me say, instruction on ambiguity in regulations and materiality makes a difference. And I would say, and it's appealing to argue the case in this sense, putting aside all of the facts of this case, the Court is about to make a major decision, whatever the outcome of the case, because it has to decide the abstract question of law, of whether materiality is an element of 287 in the wake of Gowden and in the wake of Nieder. And I think that whatever the Court does with the harmless error question, that the government's position that this isn't a fraud statute and there isn't a materiality element is incorrect. Let me also just point out to Your Honor, again, because I know what the problem is here. You read some of the testimony of these witnesses, and certainly without knowing that they had perjured themselves before and said quite the opposite under oath, it looks like a very, very strong case for the government. But I would submit that the very apparent strength of those witnesses, although they did have these credibility problems, makes the testimony that the Court did not allow on Mr. Grover on the grounds that which was offered on mental state all the more important, because that's the testimony that would have, in a contemporary sense, defined Mr. Seaton's mental state as to what he was doing and thinking about the audit at the time. So that issue is important. I'm going to try and reserve at least three minutes, but there's one issue that I have to touch on before I go, and that's simply that it is not simply my opinion. I will turn to the district court. No one reading the pleadings or the hearing on loss can possibly come up with a coherent loss figure. I cannot tell you what the loss figure should be. The government has the burden of proving it. You look at Judge Patel's statements again and again and say you're not making sense. They used an intended loss figure, then they shifted to an actual loss figure. You can't possibly figure out loss because there's two things that they never, ever prove. One is, what was St. Luke's pay? It's not in the record. And secondly is, were they really entitled to be paid? And the Court threw up its hands at the end. I submit it's the difference between, for a 67-year-old man, a potential, the Court initially said a level 16 two-year sentence, later on, 78-month sentence. If we're going to have a difference of five years, this Court ought to be able to read all of the sentencing pleadings and say we understand how the calculation is made. What do you think the variable is there? What's the variable amount? Isn't it about $80,000 between the various figures that were given? Well, in the government's, yes, the government's view may have varied only by $80,000. And Your Honor might say, well, up at that level, it doesn't make that much difference in terms of a point difference. But when the defense cross-examined, they said take your figures. Okay. Take the figure that you say that St. Luke's received. Take the figure that's phony, okay, that you say is phony. That ought to leave you with the amount that they're entitled to. They did that, and they came out with a number drastically below the routine cost limits that they were absolutely entitled to. So, Your Honor, I submit that because they never established what was actually paid or what should have been paid, we can't on this record say, hey, there's a discrepancy of a couple hundred thousand dollars. Let's cut the difference or let's say it's a point or two. I submit the only way we can do it is remand it back there and get the numbers right. It is difficult. It is complex. The Court has said that. She said if I had to deal with Medicare, you know, I'd go out of my mind. We're just going to have to have a full evidentiary hearing because the other important variable, and then I'll sit down with one minute left, is that the Court made a figure of 234,000, which was a level 16. She then, the government submitted a brief. She then raised it to a level 28 without reopening the evidentiary hearing. And the record is clear that the defense at the end of the evidentiary hearing said we were going to call an expert to prove our case. But if you use $234,000, we'll rest. At a minimum, we've got to have a chance that they put on all of the evidence that they would on the question of loss. I've got one minute left, Your Honor, and I hope to reserve that. Thank you. Thank you. Good morning. May it please the Court. I'm Amber Rosen representing the United States in this matter. I want to briefly touch on the instructional error claimed by the defendants and then talk briefly about loss and finally address the hearsay issue. In terms of materiality, this Court need not decide here whether Section 287 requires materiality, and that's for two reasons. One, defense's argument ignores the procedural posture in which this claim is being raised and also ignores that there's currently controlling authority in this case, in this circuit, Taylor, which has already decided that issue. With respect to the procedural posture, whether or not the error was invited, it certainly was waived. Under Olano, a waiver is a knowing relinquishment of a known right. But what was the known right at this point? Well, the known right was the right, was the alleged right. It's not even a right. But the alleged right to have the jury instructed that materiality is an element of Section 287. In the face of a ruling that says what you just said at the beginning, that Taylor already decided the issue, rightly or wrongly, if that's true, but that assertion may or may not be accurate, but that certainly is your position. So what's the waiver? Isn't it more of a forfeiture? Well, I think it's a – it's not a forfeiture in the sense of the defendant did not simply fail to object to the government's instruction, for example, or there would be no evidence in the record, for example, of whether he was aware that perhaps materiality was an issue. Here, what happened was the defendant provided – proffered an instruction to the court saying, instruct on materiality. And then, without any ruling by the court or any indication of how it was going to rule, but after seeing the government's opposition, voluntarily withdrew the – his proposed instruction and acceded to the government's instruction. But, counsel, that all leads to their not recognizing that they have a, quote, known right, end quote. Well, I don't – I don't think that's true. I think it shows that there was an acknowledgment that now that they were made aware of Taylor, they knew that they didn't have such a right, and so they dropped the issue. I'm sorry. Who made them aware of Taylor? The government, in their objection to the defendant's proposed instruction, cited Taylor. Okay. In light of that, they looked at your case and decided what you opened with was right, so they withdrew it. Yes. That's what I'm – I think that's what you can fairly infer. What they should have done is what? What should they have done to preserve it? Well, they could have not withdrawn it and argued to the court that Taylor somehow wasn't controlling. My point is just that they didn't do that, and that means that it's waived and this Court shouldn't even consider it. Even to the extent that the Court decides to consider it, clearly, plain error would be the standard of review. And because of Taylor, there simply can't be plain error. Taylor squarely addressed this issue. The defendant in that case raised this exact claim of error, that materiality that the jury should have been instructed on materiality in the context of a 287 claim and also a 1001 claim. And there the Court said, yes, we agree it's an element of 1001 and the jury should have been instructed, it shouldn't have been a judicial issue, but we don't find it's an element of 287. And in any event, didn't they go on and say, in any event, it wouldn't have been submitted to the jury? They did seem to suggest that. And that aspect of it seems to be overruled by Gowden. Well, it may be, but doesn't it suggest that Taylor wasn't absolutely, for all days, absolutely deciding, since it reserved the position in an alternative formulation of its ruling, whether it's an alternative holding or whatever? I don't think that – I don't believe that that's so. As to whether or not it's even an element, it squarely held that it wasn't. To the extent that it went on to say whether it would be a – even if it were an element, whether it would be a matter for the judge or jury is a separate issue. And the fact is, no cases have overruled Taylor. The Nader case was not a 287 case. No, but it certainly undermines some of the logic of Taylor, or at least it weakens the logic, doesn't it? Perhaps. But there's also the Supreme Court precedent of Wells, which buttresses that materiality is not an element of 287 in the circuit. So even whether it's a question that still needs to be resolved by the Supreme Court, for all intents and purposes today, Taylor is still the controlling authority. Wells provides Supreme Court support for the continuing viability of Taylor. And certainly the Court, not even being asked to instruct a materiality, not being cited the Nader case at all, did not commit plain error in relying on that case. In terms of – I want to turn now to the ambiguity instruction. I think the point to emphasize here is defendant got what he asked for. He asked for an instruction on his theory of defense that his interpretation of what he was required to report was reasonable, and the Court gave it. Let's be – so really what the Court here is reviewing was the discretionary decision of the district court as to how exactly to word the instruction. And the case – there's many cases in the circuit talking about the fact that their theory is put forward and the overall instructions make it clear that's all they're entitled to. Here, what the – what the defendant asked for was an instruction which read – sorry, I'm on the wrong page. And this is what the defense requested. You may find that ambiguity exists in the Medicare provider reimbursement guidelines. If you find that an ambiguity exists, then to prove that defendants knew their statements to mutual of home law were false, the government must prove beyond a reasonable doubt that there was no reasonable interpretation of the situation under which the defendants could have believed they were acting unlawfully – I'm sorry, were acting lawfully. This was the instruction provided. Quote, the government has a burden of proving beyond a reasonable doubt not only the defendant's statements were false, but that there is no reasonable interpretation of the requirements or inquiries to which the statements responded that would make the statements factually true. Those are substantially similar. Those put the defendant's theory before the jury. In addition, the jury was instructed that they had to know – that they had to believe the statements were false, that they had to believe the statements were known to be false by the defendants at the time. And I don't think there was really any basis to find that there was error or that somehow the defendant didn't get his theory before the jury or wasn't adequately instructed on the reasonable interpretation theory. Neither – one of his claims is that it didn't use the word ambiguity. It just talked about reasonable interpretation. Well, even Whiteside, the case relied on by defendant to get the instruction, only talks about reasonable interpretation and does not use the word ambiguity. And in this Court's case in Munez, where it was talking about when a defendant has the right to the reasonable interpretation statute, this Court used language which was basically tracked verbatim by the district court here. Munez said, in those kinds of cases, quote, the prosecution must prove beyond a reasonable doubt that the requests were subject to no reasonable interpretation that would make the defendant's responses to the agency's requests factually true. So it was taken directly from a controlling case in this circuit that the district court seems to have gotten its language. And for that reason, I don't believe there was any error from that instruction. Turning now to the loss. The issue here, I believe, is where there is a reasonable basis for the loss, where it presents a reasonable theory of loss should the sentence be reversed. And the answer. Kennedy. The audit accurately disclosed the loss. I'm sorry? Why didn't the government audit accurately disclose the loss? Well, Your Honor, during the midst. That's what you hired them for, wasn't it? OMA insurance? Well, yes and no. In the course of the audit, they did, as is clear from the record, they audited a couple of months and they found these discrepancies and then they discovered the false records. And at that point, it's my understanding, it was referred criminally. There was indications of fraud. So the audit at that point wasn't completed to determine what the actual numbers were to go through the administrative process. It was then referred criminally. And, of course, for criminal purposes, the loss can be calculated slightly differently or they don't rely on the civil, what civil audit numbers would be. I think what needs to be kept in mind is this is the kind of case, I mean, the Medicare program is very complicated. The way that the payments work are complicated. What they're trying to parse out is one small section of the cost. It's just the nursing service cost, whereas, of course, in the context of the payments going back and forth, they're not parsed out for every single, you know, kind of cost that the provider may get reimbursed for. So the courts have been clear. You only need to make a reasonable estimate of loss. And I think the King case is particularly instructive here. In that case also, the government provided alternate theories, not alternate theories, alternate calculations of loss. The defense argued with that. The court said that this was the kind of fraud where it was inherently difficult to determine the loss. And basically, the district court just assigned a range, said, you know, it's between 200 and 350,000. That's the loss. That's what I'm sending you to. And this court said, you know, that's okay. There was sufficient evidence to support that number. The loss was inherently difficult to calculate. And we're going to say that's good enough. And I think that's a similar situation here. I mean, the government put forth a code. Yes. What do you make of opposing counsel's argument that at one point Judge Patel had a very modest figure and then changed their mind? Were they given an opportunity to bring in their experts to challenge that? Absolutely they were. When the court issued that order, at the end of the order it says, defendant at the end of the order correcting her mistake, Judge Patel wrote at the end of the order, and the defendant has 20 days to respond. And the defendant did respond. They filed another sentencing memorandum. And with that memorandum, they submitted the expertise of an expert, Kim Hayes. They provided an affidavit and documentation from her. And they never asked for another evidentiary hearing. They decided rather than ask for an evidentiary hearing to put on their expert, they would just submit their expert's information through the form of their sentencing memorandum and affidavit. So they submitted that additional evidence to the court, and the court was able to consider that before issuing its final ruling in which it said, I don't believe the defense has offered anything new or persuasive, and I'm staying with the loss that I initially determined. And I think what's important to keep in mind about that loss is what it represented, as you can see in the defendant's, in the government's opening sentencing memorandum and from Mr. Potter's testimony at the evidentiary hearing, was that it was based on the cost report. Look, here's the amount that they were claiming for the nursing costs for the Medicare patients. And they couldn't just take the line 16 where the nursing costs, but they actually reduced that so that to make sure that it only accounted for Medicare patients, because sometimes non-Medicare patients could be in the Medicare section, although not vice versa, and then said, we're going to subtract from that amount claimed the average per diem cost, which is what a provider gets when they provide services, but they don't provide records to document actual costs, and we're going to give them that difference. And that's what the government's figure was. Now, this is a very conservative estimate of loss. Let's talk for a moment what it doesn't include. It doesn't include any amounts claimed under the exemption to the routine cost limit. Defendants claim that they would have only gotten routine costs is simply wrong and belied by Potter's testimony at the evidentiary hearing. At the government's excerpt of record, pages 228 to 230, Mr. Potter testified every year defendants asked for an exemption to the routine cost limit, and every year they were paid in their interim payments that they got monthly above their routine cost limit. Do we know what they were paid and what they should have been paid? Well, not exactly. In other words ---- That would be the cleanest way, wouldn't it? Yes. And that was very difficult to do, as I say, in part because the payments aren't parsed out by nursing costs versus other kinds of costs. I mean, they were getting big lump payments every month. But Mr. Potter did testify, and that goes to part of why this estimate was so conservative. The amounts that were included as the difference between the amounts claimed in the cost report less the average per diem that were provided in the sentencing memorandum, the 1.5 figure, the 1.6 is in the indictment. Did all of this money go to the defendant? Well, it all went to the provider, St. Luke's, yes. So it's St. Luke's that you're not tagging the individual with the dollar amount? Yes, we are. In other words, he was the ---- he was convicted of the same offenses. I mean, did he embezzle it from the company? There was no ---- He didn't embezzle it from the government. He didn't accept anything from the government to which he was not entitled? No, that's not true. The company did it, right? The corporation? Well, yes, but he, as the president and CEO of the company, while he may not have pocketed it, he benefited from St. Luke's profiting from this scheme. I mean, he was able to keep his hospital going. He was able to make a profit. He was able to take his salary as the CEO. So I think it's all part and parcel. When you look at those numbers, you look at the whole operation, Medicare and non-Medicare combined, don't you? So you really don't peel out Medicare? No, but I'm ---- but presumably ---- I mean, I think one can infer that he was also benefiting from this, which is why he's perpetuating the fraud in the first place. If you were a criminal defendant, would you like somebody inferring the amount that you were responsible for? Well ---- Or would you like some evidence? I think that the question of whether he versus the corporation should be ascribed the loss is a slightly different question from whether the loss itself was ---- whether the loss itself was reasonable. And I also would like to point out, Mr. Seaton has never himself raised the issue that he shouldn't have been ascribed the same loss as the corporation. So I don't think that issue is really before the court. He hasn't objected to the loss on that basis ever in the district court or before this court. Now, what I wanted to get back to was the reasonableness of this as the loss. It's a very conservative estimate, not only because as Potter testified, the ---- that damage amount, the $1.5 or $1.6 million figure, was in fact paid out. He testified that. He said, look, it's a little bit difficult to look exactly at what St. Luke's got, but I can tell you that those monies were received by them. It didn't include any amounts claimed for the exemption above the routine cost limit. It didn't include any overhead costs associated with the nurses. It didn't include any relevant conduct. So I think the loss figure can and should be upheld, and I think King provides strong authority for the district court's ability to have some flexibility. And as even Mr. Reardon conceded, the difference between the $1.5 and the $1.6 is harmless, because it was all in the same guideline range and the defendant got the low end of that range. I want to turn, unless there's more questions on loss, I want to turn for a moment to the hearsay issue. What I want to emphasize here is, one, of course, we don't believe the district court abused its discretion in preventing Grover from testifying that Seaton instructed him not to turn over any documents. But putting that aside for a moment, I think it's clear that even if it were error, it was harmless, and it's harmless for four reasons. The first was the defendants got insufficient, got in quite a bit of evidence from which they could make the same argument, and they did argue it strenuously to the jury. What they did get in was that Grover testified that after Seaton learned of the audit, they had a conversation. After the conversation, it was Grover who had the authority to decide what documents to give to the auditors. Three, that only later, after the audit, when they were discussing these false schedules and what was provided to the auditors, Seaton was very upset. They also got in the testimony of Mr. Maus, Moss, I'm sorry, that the defendant was very upset upon learning that the false documents were given to the auditors and demanded that Mr. Moss find out who did this. And then they made strong use of this in their closing argument, saying, and this is in the record at 2384 of the transcript during the closing argument, this is what they argued. Seaton went on his trip. Orrin, Orrin Grover, is left with the decision-making power. Does that not tell you that Seaton has no intent to give them fraudulent documents? It tells you he didn't have any intent. It says, Orrin, you decide. So they were able to make the argument they wanted to make to the jury. The second reason it's harmless. This evidence is inculpatory as it is exculpatory. Count 6 charges the defendant with obstructing the audit not by providing false documents but by refusing to furnish true documents. And this statement, don't give them any documents, also shows his intent not to provide them the true documents. So the government could have made as much use of this as the defendant seems to think he could have made of it. So it would have come in as an admission and therefore not hearsay. True. Yes. I mean, it could have if we were offering. It has to be, of course, offered by the party opponent, and we didn't do that. But had the defendant gotten it in under his hearsay theory, because it would have been hearsay for him to offer it, we could have made use of it, of course, and I think just as effective use. Third, there was strong other evidence of his intent to lie to the auditors. While the district court may have called into question two of the three witnesses, Swietlowski and DiMano, the fact is their testimony was interlocking and corroborative of each other. And, moreover, there was also Ms. Leong, whose credibility the court did not call into question, who said she was instructed by the defendant to put up false floor plans so that the auditors would think they had a distinct certified part, which they didn't. And then both, of course, DiMano and Swietlowski testified as the false documents. I see that my time is up, and I thank the Court for its attention. Thank you. Your Honor, I think I can make this in a minute. Taylor, as I think the Court is aware, not only does not squarely hold that materiality is not an element of 287, it doesn't hold it at all. It was a Gowden hearing. It was overruled by the Supreme Court in Gowden. Neither is clear that if it's a fraud statute, materiality is an element. So I submit that the law is clear that materiality is an element of this statute. You said that we held that it was, that 287 had a materiality element? No, I — Is it Alfereen or something like that? No, no. I beg the question. I said Alfereen holds that the failure to instruct on materiality, if it's an element, it's a different statute entirely, is plain error. Alfereen is a recent case by Judge Berzon, which is cited in our reply brief. And secondly, the parts of the instruction that the Migliaccio instruction that the defense wanted were ambiguity, which is key, and ambiguity in a regulation, a law. Those are the two things that were completely missing from Judge Patel's instruction. She didn't mention ambiguity, and she didn't mention ambiguity in a regulation. It was an ambiguity in a request. It sounds like a request for a statement. Your minute's up. No. You're going to hold. Thank you, Your Honor. Thank you.
judges: B. Fletcher, Beezer, Fisher